# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

JOHN P. NESTER,

                    Plaintiff,

v.

                                                    Case No. 22-CV-1362-JPS

BIOMET, INC., BIOMET
ORTHOPEDICS, LLC, BIOMET U.S.
RECONSTRUCTION, LLC, and
BIOMET MANUFACTURING, LLC,

                    Defendants.                     **ORDER**

---

## 1.    INTRODUCTION

In this action, Plaintiff John P. Nester ("Plaintiff") sues Defendants Biomet, Inc., Biomet Orthopedics, LLC, Biomet U.S. Reconstruction, LLC, and Biomet Manufacturing, LLC (collectively, "Defendants"), who manufactured Plaintiff's metal-on-metal hip prosthetic that allegedly caused metal contamination within his body. *See generally* ECF No. 5 (amended complaint). Plaintiff brings strict liability claims for design defects, *id.* at 21–23, and manufacturing defects, *id.* at 26–28; negligence claims for design defects, *id.* at 25–26, and manufacturing defects, *id.* at 28; and a claim for punitive damages, *id.* at 32–33. For relief, Plaintiff seeks compensatory damages for pain, suffering, emotional distress, reduction in

quality of life, and other non-economic harms; medical expenses; punitive damages; all pre- and post-judgment interest; and attorney's fees. *Id.* at 33.[1]

On February 2, 2024, Defendants moved for summary judgment on the grounds that Plaintiff's suit is barred by Wisconsin's three-year statute of limitations on personal injury suits, or alternatively that Wisconsin's fifteen-year statute of repose bars Plaintiff's strict liability claims.[2] *See*

---

[1]Plaintiff included in the amended complaint additional causes of action for strict liability failure to warn, ECF No. 5 at 23–25; negligent failure to warn and negligent marketing, *id.* at 26; breach of express warranty, *id.* at 28–29; breach of implied warranty, *id.* at 29–30; and fraudulent concealment, *id.* at 30–32. On February 1, 2024, the parties "agreed" that Plaintiff would withdraw these causes of action (Counts II, IV, VII, VIII, and IX in the amended complaint). ECF No. 18 at 4 n.1.

This voluntary dismissal, agreed upon outside of court, is permitted under Federal Rule of Civil Procedure 41(a)(1)(A). It occurred one day before Defendants moved for summary judgment, so the Court will construe it as a notice of voluntary dismissal. *See id.* at 41(a)(1)(A)(i) ("[T]he plaintiff may dismiss an action without a court order by filing . . . a notice of dismissal before the opposing party serves either an answer or a motion for summary judgment . . . ."). Moreover, the Court may permit dismissal of individual claims under Rule 41. *See Gatling v. Nickel*, 275 F.R.D. 495, 496 (E.D. Wis. 2011) ("Rule 41 contemplates, more generally, a court's power to dismiss individual claims. . . . It would seem needlessly constraining, where Rule 41 otherwise contemplates the dismissal of individual claims [over the objection of a party], to prohibit the dismissal of individual claims under Rule 41(a) where both parties have stipulated to such."); *but see Berthold Types Ltd. v. Adobe Sys., Inc.*, 242 F.3d 772, 776–77 (7th Cir. 2001) ("Rule 41(a)(1)[(A)](i) does not speak of dismissing one claim in a suit; it speaks of dismissing 'an action' . . . ."). Normally, the Court would require that the dismissal of claims be memorialized in a separate notice. Fed. R. Civ. P. 41(a)(1)(A)(i). Since the remainder of Plaintiff's claims are disposed of through summary judgment herein, however, the Court will treat the footnote in Defendants' brief as Plaintiff's notice of voluntary dismissal, adopt it, and dismiss these claims without prejudice. *Id.* at 41(a)(1)(B) ("Unless the notice or stipulation states otherwise, the dismissal is without prejudice.").

[2]The statutes of limitations and/or repose argument is Defendants' second affirmative defense. ECF No. 11 at 48 ("Plaintiff's claims are barred, in whole or part, by the applicable statute(s) of limitations and/or repose."). Defendants withdrew various of their affirmative defenses. ECF No. 18 at 4 n.1. Defendants'

*generally* ECF No. 18; *id.* at 22 (seeking summary judgment on "all of Plaintiff's claims"). For the reasons set out below, Defendants' motion will be granted.

## 2. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A "genuine" dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court construes all facts and reasonable inferences in a light most favorable to the nonmovant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016) (citing *Burritt v. Ditlefsen*, 807 F.3d 239, 248 (7th Cir. 2015)). In assessing the parties' proposed facts, the Court must not weigh the evidence or determine witness credibility; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010) (citing *Anderson*, 477 U.S. at 255 and *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 604 F.3d 490, 505 (7th Cir. 2010)).

## 3. RELEVANT FACTS[3]

### 3.1 Hip Implant Surgeries

In approximately 2000 or 2001, Plaintiff began experiencing significant pain in his left hip. On January 29, 2002, Plaintiff underwent a

---

remaining affirmative defenses, *see* ECF No. 11 at 49–59, will not be addressed in this Order.

[3]The parties submitted a stipulated statement of undisputed facts. ECF No. 19. For purposes of the motion for summary judgment, the Court will adopt those

total hip arthroplasty on his left hip, performed by Dr. Michael Welch ("Dr. Welch"). Plaintiff received a Biomet M2a-38 acetabular shell and a 38-mm modular femoral head (both manufactured in November 2001), which consisted of a cobalt chromium metal-on-metal articulation. On February 25, 2003, Plaintiff underwent a total arthroplasty on his right hip, also performed by Dr. Welch. Plaintiff received a Biomet M2a-38 acetabular shell (manufactured in January 2003) and a 38-mm modular femoral head (manufactured in October 2002), which also consisted of a cobalt chromium metal-on-metal articulation.

### 3.2    2017 Medical Treatment

In 2016 or 2017, Plaintiff began experiencing bilateral hip abductor pain. On October 27, 2017, Plaintiff visited Dr. Steven Merkow ("Dr. Merkow"), an orthopedic surgeon in Wisconsin. Plaintiff reported bilateral hip and thigh pain associated with "mechanical type noises" sounding like "metal grinding gears." Dr. Merkow's October 27, 2017 office note states that Plaintiff was "specifically seen today requesting an opinion as to whether his significant and unrelenting bilateral hip pain is associated with any prosthetic failure or metallosis." Plaintiff raised the issue of potential metallosis with Dr. Merkow, and Plaintiff mentioned his prior cobalt and chromium blood tests, which his primary care provider had previously ordered.

Dr. Merkow defined metallosis as follows:

When there [are] two metals that are either articulating or moving against each other or two metals that are connected to each other, sometimes there can be [] what's called fretting of some of the inherent metal in those pieces, and that can

---

stipulated facts that are material. The Court has made minor, non-substantive edits and has omitted citations to the record.

> cause – most often may cause some local tissue reaction. Also
> it can get into the – at various levels into the bloodstream.

Dr. Merkow also stated that checking for cobalt and chromium metal ion levels in the bloodstream is how one tests for metallosis. Dr. Merkow testified that metallosis can cause what is known as a "pseudotumor," which he defined as "thickening of [hip] tissue" and the "collection of some amount of fluid that is encapsulated in [hip] tissue" that "forms as a reaction to the metal." He further testified that metal-on-metal hip devices can cause metallosis and pseudotumors, both of which can be harmful to patients.

Dr. Merkow testified that his medical notes are (a) always dictated contemporaneously with his treatment of his patients, including Plaintiff; (b) true and accurate depictions of what Plaintiff told Dr. Merkow on the particular date of treatment; and (c) true and accurate depictions of Dr. Merkow's impressions of Plaintiff on the particular date of treatment. Dr. Merkow also testified that it was custom and practice to use the "subjective" section of his medical notes to record information that Plaintiff reported to him during a particular visit.

At the October 25, 2017 visit, Dr. Merkow reassured Plaintiff that, "clinically and radiographically, there is no obvious prosthetic failure noted on today's evaluation." Dr. Merkow's notes state Dr. Merkow would "also discuss the matter further with the Biomet representative to determine whether there are known issues regarding the early prosthetic failure and metallosis." Dr. Merkow stated that there was the "potential that [Plaintiff's] symptoms are associated with a referred or radicular process of the lumbar spine."

At the October 27, 2017 visit, Dr. Merkow also ordered blood work to test Plaintiff's serum cobalt and chromium levels. The results were reported on October 28, 2017. Plaintiff requested and reviewed the results of the metal ion testing in November 2017. Plaintiff viewed these results as abnormal, with cobalt levels that were approximately ten times the "permissible level." Specifically, Plaintiff's chromium levels were 11.6 ug/L (reference range 0.2 to 0.6 ug/L), and his cobalt levels were 32.3 ug/L (reference range ≤ 3.9 ug/L). Plaintiff viewed the elevated cobalt levels as a "serious problem," but he "wasn't sure" as of November 2017 whether the metallosis and cobalt toxicity was caused by his Biomet hip implants.

At some point in 2017, Plaintiff reviewed an article about Boeing suing Biomet in an action related to a worker's compensation claim (the "Boeing Article"). Plaintiff testified that he believes the article was sent to him given his employment experience in worker's compensation claims related to medical devices, for the purposes of assessing whether a similar strategy of "suing the manufacturer of the device" could be applicable to one of Plaintiff's cases. The Boeing Article describes a lawsuit in which Boeing alleged that Biomet's M2a hip device was defective and caused Boeing's employee to suffer a workplace injury. The Boeing Article discussed the allegations that the Boeing employee "began experiencing extreme pain and persistent squeaking of the hip," with subsequent revision hip surgery to replace the M2a metal-on-metal implant.

Plaintiff testified that after reading the Boeing Article, he "really didn't know" whether his bilateral pain and excessive cobalt and chrome could have been caused by his M2a hip devices and that while he read the article in part due to the "audible noise issue" with the M2a hip devices, he was "more focused" on the potential application of the "subrogation

strategy" discussed in the Boeing Article to one of the worker's compensation cases he was overseeing in connection with his employment.

### 3.3    2018 Medical Treatment

In February 2018, Dr. Merkow's office notes indicate that Plaintiff called Dr. Merkow's office stating that "he thought [Dr. Merkow's office] would be sending him information on metalosis [sic]." The medical note indicates that Plaintiff also reported having a "metal taste in his mouth and wondered if that was due to the metal[l]osis." Dr. Merkow's office advised Plaintiff that Dr. Merkow "felt the metal taste in his mouth is not due to metal[l]osis but may relate to his diabetes."

In June 2018, Plaintiff had additional metal ion blood levels drawn to test his cobalt and chromium levels. Plaintiff reviewed the results when they came in and understood that the results showed that "the levels were increasing [] significantly." Specifically, the metal ion results showed that Plaintiff's cobalt levels were 50.8 ug/L, compared with 32.3 ug/L in October 2017. Plaintiff believed that the elevated cobalt and chromium "[wa]s significant" and "couldn't believe" that his cobalt was that high. Plaintiff was concerned with the results of the testing because he believed cobalt and chromium to be "known carcinogens," and his "biggest concern was and continues to be" the effect that the cobalt and chromium might have on his body and organs.

In early December 2018, Plaintiff reached out to the U.S. Food and Drug Administration ("FDA") to get information about his hip devices and the cures, medications, and treatment protocols for his elevated cobalt and chromium levels. Around that same time, Plaintiff contacted Zimmer Biomet to find out exactly what M2a devices he had received, to see if there was a recall related to those devices or any programs offering "replacement

parts," and to figure out "whether the products implanted in his body were defective." On December 7, 2018, Plaintiff sent Zimmer Biomet his cobalt and chromium blood test results.

On January 10, 2019, Zimmer Biomet sent Plaintiff a list of the specific M2a hip devices he had received, identified that the implants were made out of cobalt and chromium, and included a link to the FDA website on metal-on-metal hip implants. Plaintiff was "caught off[]guard" by the fact that his hip devices used non-titanium components, and at that point he "knew [he] needed to get resolution or a cure to the problem because, again, [cobalt and chromium] are known carcinogens," which he viewed as "a big problem." Zimmer Biomet referred Plaintiff to its outside counsel.

### 3.4    January 2019 Medical Treatment and Related Events

In or around January 2019, after receiving the information from Zimmer Biomet, Plaintiff did additional research about cobalt and chromium metal poisoning and eventually found an article from the Maglio Law Firm titled "Cobalt and Chrome Metal Poisoning From Hip Replacements, What is Considered a High Metal Level?" (the "Maglio Article"). The Maglio Article specifically claimed that the Biomet M2a hip devices were defective and caused metallosis, metal poisoning, and pseudotumors. At the time that Plaintiff read the Maglio Article, Plaintiff was aware of his metallosis, as illustrated by his prior cobalt chromium blood test results. Plaintiff sent the Maglio Article to Dr. Merkow's office at some point before October 4, 2019, when Dr. Merkow's office scanned the article into Plaintiff's medical record. Plaintiff also later sent part of the Maglio Article to Dr. Joseph Davies's ("Dr. Davies") office on November 15, 2019.

### 3.5 February 2019 Medical Treatment

On February 11, 2019, Plaintiff returned to Dr. Merkow for follow-up regarding bilateral hip and abductor pain, balance issues, and audible mechanical noises. Dr. Merkow testified that, at this visit, he reviewed Plaintiff's prior cobalt chromium studies from October 2017 and June 2018 showing elevated cobalt and chromium levels with Plaintiff, and he conducted a physical examination of Plaintiff which revealed abductor gait and abductor weakness. Dr. Merkow concluded at the February 11, 2019 visit that, given Plaintiff's worsening symptoms and elevated cobalt and chromium levels, Plaintiff was "headed toward potential revision surgery"[4] of the femoral head and liner to get rid of the metal-on-metal articulation, which Dr. Merkow believed was causing the elevated cobalt and chromium levels.

Dr. Merkow testified that he advised Plaintiff of his recommendation for likely revision surgery, including "the fact that those [cobalt and chromium] levels were going up, his symptoms were likely explained by that, and this probably will continue to worsen, so now we're in a stage where it's probably better—there is more risk in leaving it alone than the risks associated with the surgery to change the articulations and hopefully arrest or lessen the problem of elevated metals." Also during that February 11, 2019 visit, Dr. Merkow introduced Plaintiff to Dr. Mitch Klement ("Dr. Klement"), a fellowship-trained orthopedic surgeon in hip and knee revision arthroplasty, who Dr. Merkow recommended perform any forthcoming revision surgery on Plaintiff. Plaintiff was "very

---

[4]Dr. Merkow defined a "revision surgery" as an operation in which a prosthetic component "that has had some problem or failure and needs correction" is removed.

Case 2:22-cv-01362-JPS    Filed 08/30/24    Page 9 of 31    Document 28

disappointed" that Dr. Merkow was referring him to Dr. Klement, because he did not think that Dr. Klement was qualified to perform the revision surgery.

Also at the February 11, 2019 visit, Dr. Merkow recommended a MARS MRI scan to determine whether Plaintiff had any pseudotumors in his hips, which would have a "high likelihood" of being caused by the metal-on-metal hip devices. The MRI—taken on February 13, 2019— indicated that Plaintiff had bilateral soft tissue damage on both hips, with "fluid distended pseudocapsules bilaterally with thickened and irregular synovial walls." Dr. Merkow testified that the MRI results reaffirmed his recommendation that Plaintiff undergo revision surgery.

### 3.6 April 2019 Medical Treatment

Plaintiff returned to Dr. Merkow on April 19, 2019. Dr. Merkow reported in the visit notes that Plaintiff continued to have ongoing balance issues, pain, and weakness in both hips, and that Plaintiff "ha[d] become progressively more frustrated with his hip pain and balance problems." Dr. Merkow testified that he discussed the results of the February 13, 2019 MARS MRI with Plaintiff during this visit, including informing Plaintiff that his bilateral pseudotumors were "consistent with typical metal-on-metal pseudotumors/pseudocapsules" and that it was "extremely likely that it's the metal-on-metal [devices] and the reaction that it's causing because of the metallosis." Plaintiff testified that he does not recall discussing the results of the February 2019 MARS MRI. At the April 19, 2019 visit, Dr. Merkow reported that Plaintiff "ha[d] extensively researched these issues," had "contacted Biomet," and "wonder[ed] next steps."

Dr. Merkow diagnosed Plaintiff with metallosis and pseudotumors from Plaintiff's bilateral metal-on-metal hip devices, as confirmed by the

previous metal ion testing and MARS MRI. Dr. Merkow also concluded that Plaintiff's abductor weakness was likely related to Plaintiff's metallosis and pseudotumors. Dr. Merkow recommended that Plaintiff "strongly consider" proceeding with revision surgery as soon as possible to "slow or arrest the problem that was occurring and to hopefully prevent damage that couldn't be . . . more easily corrected." Dr. Merkow also advised Plaintiff of the risks and benefits of revision surgery in Plaintiff's case.

Plaintiff reported to Dr. Merkow that he was "thinking about having [the revision surgery] done in September 2019, after his daughter's wedding." At the April 19, 2019 visit, Dr. Merkow again referred Plaintiff to Dr. Klement and encouraged Plaintiff to see Dr. Klement "as soon as possible." Plaintiff testified that after Dr. Merkow recommended that Dr. Klement perform any revision surgery, Plaintiff "blanked out," and he "shut down" because he was angry at being referred to a doctor whom Plaintiff did not view as qualified. After finding out that Dr. Merkow would not do the revision surgery, Plaintiff decided that he "wasn't going to have any more treatment done through that group." Plaintiff did not follow up with Dr. Merkow or Dr. Klement to schedule revision surgery.

### 3.7 Treatment with Dr. Davies

On November 7, 2019, Plaintiff reached out to Dr. Davies's office to ask whether he could perform bilateral hip revision surgery on Plaintiff. Plaintiff had learned of Dr. Davies from previously having contacted a local Wisconsin attorney who had recommended Dr. Davies as a surgeon who did "the type of surgery [Plaintiff] needed." Plaintiff reported to Dr. Davies's office that he had bilateral hip pain that had been going on for 25 years.

On October 12, 2020 and February 28, 2021, Dr. Davies revised Plaintiff's left and right hips, respectively. Dr. Davies removed the M2a cobalt chromium metal-on-metal articulation from both hips.

### 3.8 Plaintiff's Lawsuit

On November 17, 2022, Plaintiff filed this action against Biomet. Plaintiff alleges that the M2a hip implants used in his total hip replacement surgeries were defective and caused him personal injury—specifically, pain, metallosis, metal toxicity, pseudotumors, and tissue necrosis, among other economic and non-economic injuries. Plaintiff seeks damages for medical expenses and inhibited quality of life dating all the way back to 2002.

## 4. ANALYSIS

Defendants move for summary judgment on the basis that Plaintiff's claims are time-barred under Wisconsin's three-year statute of limitations period for personal injury actions, or in the alternative under Wisconsin's fifteen-year statute of repose for strict liability product liability claims. ECF No. 18 at 6–21. The parties dispute when Plaintiff truly discovered the cause of his injuries and accordingly when Wisconsin's statute of limitations for filing a personal injury suit began to run. *See generally id*.; ECF No. 26 at 4–13. They also dispute whether Plaintiff's injuries constitute a "latent disease" under Wisconsin products liability law and accordingly whether his claims are barred by the statute of repose. ECF No. 26 at 11–12; ECF No. 27 at 19–22. The Court examines each issue in turn. For the reasons discussed below, the Court finds for Defendants on both of these issues and will grant their motion for summary judgment.

### 4.1 Statute of Limitations

Defendants argue that the undisputed facts in this case show that Plaintiff "knew or should have known of both his injuries and their likely connection to his Biomet M2a hip devices as early as January 2019, and in any event no later than November 15, 2019." ECF No. 18 at 5 (citing Wis. Stat. Ann. § 893.54). They contend that "[a]ny one of these dates was sufficient to trigger the [commencement of the three-year] statute of limitations under Wisconsin law," and because Plaintiff waited to file suit until November 17, 2022, his claims are time-barred. *Id.* at 22.

Wisconsin law[5] provides that any personal injury claim must be brought within three years of the claim's accrual. Wis. Stat. § 893.54(1m)(a). A claim accrues when "the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, not only the fact of injury but also that the injury was probably caused by the defendant's conduct or product"—often referred to as the discovery rule. *Borello v. U.S. Oil Co.*, 388 N.W.2d 140, 146 (Wis. 1986).

Critically, the discovery rule requires that the plaintiff "'discovers both the nature of his or her injury and its cause,' so that 'the relationship between the injury and its cause [is] more than a layperson's hunch or belief.'" *Karnes v. C. R. Bard, Inc.*, No. 18-cv-931-wmc, 2019 WL 1639807, at

---

[5]This suit proceeds on diversity jurisdiction. *See* ECF No. 5 at 2–5; *see also* 28 U.S.C. § 1332(a). Accordingly, the Court applies the substantive state law of its locality under the Erie Doctrine. *See Land v. Yamaha Motor Corp.*, 272 F.3d 514, 516 (7th Cir. 2001) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)). Statutes of limitations are considered substantive state law in the Seventh Circuit. *See Hollander v. Brown*, 457 F.3d 688, 694 (7th Cir. 2006) (citing *Walker v. Armco Steel Corp.*, 446 U.S. 740, 751–53 (1980) and *Wade v. Danek Med., Inc.*, 182 F.3d 281, 289 (4th Cir. 1999)); *see also Guar. Tr. Co. v. New York*, 326 U.S. 99, 110 (1945). The Court, therefore, will apply the Wisconsin statute of limitations governing personal injury suits.

Case 2:22-cv-01362-JPS    Filed 08/30/24    Page 13 of 31    Document 28

*3 (W.D. Wis. Apr. 16, 2019) (quoting *S.J.D. v. Mentor Corp.*, 463 N.W.2d 873, 875 (Wis. Ct. App. 1990)). Accordingly, "the relevant inquiry is on the strength *and* the nature of the connection between the defendant's conduct and the injury as reflected in the facts known to the claimant." *Mentor*, 463 N.W.2d at 876. More specifically, the plaintiff must have an "objective basis for determining that the defendant had a role in causing his or her injuries." *Id.* at 877 (emphasis omitted). When this occurs, the plaintiff has three years therefrom to sue for his injury. Importantly, "the discovery rule does not defer claim accrual until a plaintiff decides to see a lawyer to learn whether []he has a legally viable claim." *Henley v. C.R. Bard, Inc.*, No. 14-C-0059, 2019 WL 6529433, at *5 (E.D. Wis. Dec. 4, 2019) (citing AM. L. OF PRODS. LIAB. 3d § 47.40). Rather, the limitations period begins to run when the plaintiff knows the "operative facts of h[is] claim." *Id.*

### 4.1.1  Injury

Defendants first argue that Plaintiff knew of the injuries that he attributes to Defendants' hip implant devices—"bilateral hip pain, metal toxicity, metallosis, pseudotumors, and tissue necrosis"—more than three years before filing the complaint, as shown by several actions he undertook or information he learned between October 2017 and April 2019. ECF No. 18 at 10–14. Plaintiff first sought medical assistance in October 2017 for hip pain. *Id.* at 11 (citing ECF No. 19 at 2–4). In November 2017, he learned that he had severely elevated cobalt and chromium blood levels and regarded them as worrisome; he received confirmation of further increases in cobalt and chromium levels through testing in June 2018. *Id.* (citing ECF No. 19 at 4). Plaintiff learned from Biomet in January 2019 that his implants were a cobalt and chromium metal-on-metal device, and at that time he viewed his

high cobalt and chromium levels as problematic. *Id.* at 11–12 (citing ECF No. 19 at 7). By that time, Plaintiff was also aware of his metallosis. *Id.* at 11.

In February 2019, Plaintiff received an MRI that showed soft tissue damage and pseudotumors in his hips. *Id.* at 12 (citing ECF No. 19 at 9). Dr. Merkow informed Plaintiff in April 2019 that, based on the MRI results, it was "extremely likely" that these pseudotumors stemmed from his hip implant. *Id.* (citing ECF No. 19 at 10). For this reason, Dr. Merkow recommended that Plaintiff pursue revision surgery. *Id.* at 13 (citing ECF No. 19 at 11). All of these occurrences, Defendants argue, gave Plaintiff "objective" confirmation of his injuries (if not their full scope), and all took place before the three-year limitations period began to run. *Id.* at 12–13 & n.6 (citing *Henley*, 2019 WL 6529433, at *5 and *Borello*, 388 N.W.2d at 142–43).

Plaintiff suggests in opposition that he was not sufficiently aware of his injuries to trigger the commencement of the limitations period. ECF No. 26 at 6–8. Specifically, he argues that his elevated cobalt and chromium blood levels were not an injury in themselves sufficient to trigger commencement of the limitations period, and that "prior to 2019," his medical providers did not definitively attribute those levels or his other medical complaints to his hip devices. *Id.* at 6. He also notes that there is no basis to conclude that he found out about his pseudotumors and soft tissue injuries "prior to 2019." *Id.* at 6–7.

It is beyond dispute that Plaintiff was aware of his injuries at the very latest, in April of 2019. He concedes that he "became objectively aware that his elevated chromium and cobalt levels might be associated with his hip implant" in January 2019. ECF No. 26 at 6 (citing ECF No. 19 at 7). He stipulated that, "[i]n or around January 2019, . . . [he] was aware of his

metallosis . . . ." ECF No. 19 at 7–8. Although Plaintiff claims not to remember Dr. Merkow reporting to him in April 2019 that the MRI results showed that he had pseudotumors, Plaintiff stipulated to having been *diagnosed* at that time with pseudotumors. *Id.* at 10 (citing ECF No. 20-1 at 150 (Plaintiff testifying that he had "no reason to question" Dr. Merkow having made this diagnosis in April 2019)). Plaintiff simply has no evidence to rebut the conclusion that he knew, or had reason to know, of the injuries he complains of in this lawsuit at some point in the first half of 2019, which was more than three years before he sued.

### 4.1.2 Causation

The inquiry does not end with Plaintiff's knowledge of his injuries, of course—but the Court further finds that Plaintiff "discover[ed], or in the exercise of reasonable diligence should have discovered, . . . that the injury was probably caused by the defendant's conduct or product" more than three years before filing suit. *Borello*, 388 N.W.2d at 146.

Defendants argue that the undisputed facts show that Plaintiff had an "objective basis" to draw a causal link between the hip implants and his injuries "by January 2019, and no later than November 15, 2019." ECF No. 18 at 14–20; ECF No. 27 at 6. They note that records from Plaintiff's October 2017 visit with Dr. Merkow indicate that Plaintiff "suspected that his hip pain might be caused by either 'prosthetic failure or metallosis.'" ECF No. 18 at 14 (citing and quoting ECF No. 19 at 2–3). Furthermore, in 2017, Plaintiff read the Maglio Article, which discussed a lawsuit alleging that Biomet hip implants like his failed and caused similar injuries. *Id.* at 15 (citing ECF No. 19 at 4–5). Then, in January 2019, he sent the Maglio Article to Dr. Merkow and Dr. Davis for consideration in his own medical situation. *Id.* at 17 (citing ECF No. 19 at 8). Defendants argue that these facts

alone are sufficient to trigger the commencement of the limitations period. *Id.*

Defendants further contend that Plaintiff knew or should have suspected that his hip implants were the likely cause of his injuries because he both sought and received information from the FDA, Biomet, and Dr. Merkow between December 2018 and April 2019 regarding the potential of his hip implants being defective and causing his elevated cobalt and chronium levels. *Id.* at 15–17. In particular, Defendants point to the February and April 2019 meetings with Dr. Merkow in which Plaintiff's MRI results were reviewed and revision surgery was recommended. *Id.* 17–18 (citing ECF No. 19 at 8–11). Defendants point out that Plaintiff conceded knowing that "the products implanted in his body caused injury" at the very least when his medical providers recommended removal. *Id.* at 18 (quoting ECF No. 19 at 13). Since Dr. Merkow recommended revision surgery to Plaintiff in April 2019 at the latest, Defendants argue that Plaintiff himself has conceded his awareness of causation by that time. *See id.* at 18–19 (citing ECF No. 19 at 11). Finally, Defendants contend that as of November 15, 2019, Plaintiff "was aware of a potential legal claim related to his M2a devices and the need for revision surgeries" because he "had already contacted an attorney, who referred plaintiff to Dr. Davies for revision surgery." *Id.* at 19 n.11 (citing ECF No. 19 at 12). Finally, Defendants argue that Plaintiff's declining to pursue the recommended revision surgeries until 2020 and 2021 does not toll the limitations period. *Id.* at 19.

In response, Plaintiff argues that summary judgment is inappropriate because there are genuine disputes of material fact with respect to whether his "January and April 2019 consultations with Dr.

Merkow provided a sufficient objective basis for [him] to understand that his hip complaints were related to his hip implants." ECF No. 26 at 2. First, as detailed earlier, Plaintiff argues that, although he may have known of his injuries in 2019, he did not have an objective basis to believe that Defendants' devices *caused* those injuries until later[6] because his providers suggested that other medical causes were perhaps to blame for his symptoms. *Id.* at 6–8. Somewhat confusingly, however, Plaintiff concedes that he "became objectively aware" that his elevated chromium and cobalt levels "might be associated" with his hip implants in January 2019, when he found out that his implants were made of those same materials. *Id.* at 6 (citing ECF No. 19 at 7). He does not develop an explicit argument as to why this apparent concession does not defeat summary judgment.

Plaintiff next argues that Defendants' contentions rely on material that is unreliable and/or inadmissible, namely, (1) Dr. Merkow's "recollection," or lack thereof, "of his medical advice to Plaintiff in 2019" and (2) Plaintiff's medical records, which for the most part "are silent with respect to whether [Dr. Merkow] actually communicated with Plaintiff with respect to his impressions or diagnoses." *Id.* at 8–10.

Plaintiff argues that to conclude that Dr. Merkow's medical impressions or diagnoses provided a sufficient basis for Plaintiff to know that the hip devices were the likely cause of his injuries, there would have to be incontrovertible testimony or evidence that Dr. Merkow in fact

---

[6]Plaintiff does not stake a claim as to when he *did* become aware or have reason to suspect that that Defendants' devices caused his injuries, even suggesting at one point that having revision surgeries in 2020 and 2021 did not commence the limitations period. *Id.* at 5 (citing *In re Smith & Nephew Birmingham Hip Resurfacing (BHR) Hip Implant Prod. Liab. Litig.*, No. 1:17-MD-2775, 2018 WL 6067505, at *3 (D. Md. Nov. 19, 2018), *aff'd*, 781 F. App'x 350 (4th Cir. 2019)).

communicated all of those impressions or diagnoses to Plaintiff. *Id.* at 9. But, Plaintiff states, "Dr. Merkow testified . . . that he has no personal recollection of communicating the information in his medical records to Plaintiff, *and* he testified that it was only to the 'best of his recollection' that the advice reflected in the medical records was actually communicated to Plaintiff." *Id.*

Plaintiff argues that because Dr. Merkow does not consistently recall, and Plaintiff himself does not recall at all, such communications having taken place, Defendants have failed to meet their summary judgment burden. *Id.* He asserts that "[a]t best, this is a case of 'no recollection' vs. 'no recollection'" and therefore summary judgment is inappropriate because only a jury can determine who is more credible. *Id.* at 8–9 (citing and distinguishing *Mucha v. Village of Oak Brook*, 650 F.3d 1053, 1056 (7th Cir. 2011)); *see also id.* at 10 (arguing that the Court should not "grant Defendants any inferences that Dr. Merkow's diagnosis was communicated to Plaintiff" because Plaintiff testified that he does not recall Dr. Merkow's advice and that "he could not reconcile his subsequent actions with . . . having received the advice identified in the [medical] records" (citing ECF No. 20-1 at 149–51)).

Further, Plaintiff argues that medical records of his interactions with Dr. Merkow are unreliable because Dr. Merkow testified inconsistently as to how soon after a patient interaction he records his notes. *Id.* at 8 (citing ECF No. 20-4 at 9–10). In a footnote, Plaintiff also argues that medical records of Plaintiff's interactions with Dr. Merkow, to the extent those records are offered to prove "whether and to what degree he communicated his diagnosis to Plaintiff," are inadmissible hearsay. *Id.* at 9 n.2 (citing Fed.

R. Evid. 803(4) and (6) and *Cook v. Hoppin*, 783 F.2d 684, 689–90 (7th Cir. 1986)).

### 4.1.2.1    Reliability and Admissibility

The Court takes up Plaintiff's arguments in reverse order. First, Plaintiff's arguments that the evidence of Plaintiff's interactions with Dr. Merkow is unreliable or inadmissible—and therefore cannot support summary judgment for Defendants—are unavailing.

As a threshold matter, in furtherance of his assertion of unreliability, Plaintiff improperly cites to evidence outside the parties' joint statement of facts, which is inconsistent with the letter and the spirit of the Court's pretrial procedures order and the applicable local rule. ECF No. 9 at 4 ("[T]he Court will only consider the single, agreed-upon statement of facts. Any disputed facts must be itemized separately and supported by each party's separate pinpoint citation to the record."); Civ. L.R. 56(b)(6) ("Assertions of fact in the parties' supporting memoranda must refer to the corresponding numbered paragraph of the statement of facts, statement of additional facts, or statement of stipulated facts."). Plaintiff had notice of these requirements for nearly a year before dispositive motions were due, *see* ECF Nos. 9 and 14, and he had an opportunity to lay out any disputes of fact when the parties were preparing their joint statement of facts, but he neglected to do so. That he fishes into the record only in his briefing suggests that his portrayal of the record evidence lacks merit (and perhaps that his counsel lacked attention to proper procedure).

For the sake of complete analysis, the Court considers the record evidence that Plaintiff has pointed to in support of his position that Dr. Merkow's testimony is unreliable, and it finds the evidence unpersuasive on that score. Plaintiff's assertion that Dr. Merkow testified that "he had no

personal recollection of any of his conversations with Plaintiff" or of "communicating the information in his medical records to Plaintiff," ECF No. 26 at 8–9, mischaracterizes the record. The relevant testimony states as follows:

> [Q by Plaintiff's counsel]: I want to reflect on what you mentioned earlier today, that you do not have any significant recollection of any conversations with [Plaintiff] outside of those medical records; is that correct? .
>
> > [Defendants' counsel] Object to form. Foundation. . . .
>
> A: I do not recall any conversations with [Plaintiff] outside of our office conversations and . . . telephone. . . .
>
> Q: . . . [J]ust to reflect what you just said, you don't recall any significant conversations with [Plaintiff] outside of those records. So opposing counsel has been asking you what you remember about each one of these specific visits, these specific dates of treatment, and I want to be clear that your recollection really just comes from what is in your medical records; is that right?
>
> > [Defendants' counsel] I'm going to object to form, foundation, and misstates testimony.
>
> A: Correct.

ECF No. 27-2 at 20–21.[7]

This testimony does not establish, as Plaintiff insists, that Dr. Merkow testified that he had no recollection at all of any of his conversations with Plaintiff; to the contrary, Dr. Merkow averred that he

---

[7]Plaintiff cites to "Ex. D, 74:1–9," the deposition transcript of Dr. Merkow, which was appended in part to Defendants' moving papers at ECF No. 20-4. ECF No. 26 at 8. However, that version of the transcript is abridged and does not include transcript page 74—an omission that Plaintiff fails to mention. *See* ECF No. 20-4 at 56–57. Defendants included the full transcript of Dr. Merkow's deposition with their reply brief. ECF No. 27-2. The Court cites to pages 72–74 of the full transcript, which includes the specific lines Plaintiff has referenced, the lines that Defendants referenced in reply, ECF No. 27 at 10, and additional context.

*did* recall conversations with Plaintiff in his office and via telephone. Plaintiff also attempts to minimize Dr. Merkow's statement that his medical records reflected his care and treatment of Plaintiff "*only* . . . 'to the best of [his] recollection.'" ECF No. 26 at 8 (quoting ECF No. 27-2 at 7) (emphasis added). At best, Plaintiff has pointed out that Dr. Merkow placed a qualifier on the strength of his memory. But this testimony is simply not evidence that Dr. Merkow had no memory of his interactions with Plaintiff.

This testimony also does not establish that Dr. Merkow's "recollection was tied exclusively to what he was reading in his medical records," *id.*—that assertion came from Plaintiff's counsel over Defendants' counsel's objection. Other testimony shows that Dr. Merkow refreshed his recollection of his conversations with Plaintiff and prepared for his deposition by reviewing Plaintiff's medical records, not that he lacked an independent recollection of those records. ECF No. 27-2 at 5 ("I reviewed this case, my medical records . . . ."); *id.* at 6 ("Upon reading my notes, that jogged my memory of him."). Plaintiff makes no claim that doing so was impermissible under Federal Rule of Evidence 612 or any other rule.

Finally, this testimony does not establish that Dr. Merkow does not recall communicating his insights and diagnoses to Plaintiff, either in general or specifically on April 19, 2019. Plaintiff testified that he does not recall having discussed his February 2019 MRI results with Dr. Merkow. ECF No. 19 at 10 (citing ECF No. 20-1 at 145–46). Dr. Merkow testified that he does recall his encounters with Plaintiff, or at least that at the April 19, 2019 appointment, he recalls reviewing the results of Plaintiff's February 2019 MRI and sharing his assessment that the hip devices were causing Plaintiff's concerns. *Id.* (referencing ECF No. 27-2 at 17–18 ("A: So when you see [bilateral pseudotumors] and there are metal-on-metal articulations of

the hip joint . . . , one can make the assumption that it is extremely likely that it's the metal-on-metal implant and the reaction that it's causing because of the metallosis. Q: Okay. Did you share that information with [Plaintiff] during the April 19[], 2019, visit? A: I'm quite sure I did.")).

This is, therefore, not "a case of 'no recollection' vs. 'no recollection,'" as Plaintiff urges. ECF No. 26 at 9. Neither Plaintiff's testimony that he does not recall Dr. Merkow telling him that the hip devices were causing Plaintiff's complaints, nor the difference between Dr. Merkow's and Plaintiff's respective testimony, is sufficient to raise a genuine dispute of material fact. *Mucha*, 650 F.3d at 1056 (finding that the plaintiff's testimony that he "could not recall" whether or when he informed a defendant of a material fact was "inconclusive" and therefore insufficient "by itself [to] create a genuine factual dispute" (citing *Steinhauer v. DeGolier*, 359 F.3d 481, 485 n.1 (7th Cir. 2004) and *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001))). At most, Plaintiff has shown "some metaphysical doubt as to the material facts," but this is not enough to defeat summary judgment. *Burton v. Kohn Law Firm, S.C.*, 934 F.3d 572, 579 (7th Cir. 2019) (quoting *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010)).[8]

---

[8]Plaintiff's argument that his medical records are inadmissible to prove "whether and to what degree [Dr. Merkow] communicated his diagnosis to Plaintiff," ECF No. 26 at 9 n.2, is perfunctory and underdeveloped to the point of waiver. *Harmon v. Gordon*, 712 F.3d 1044, 1053 (7th Cir. 2013) ("We have often said that a party can waive an argument by presenting it only in an undeveloped footnote . . . ." (citing *Parker v. Franklin Cnty. Cmty. Sch. Corp.*, 667 F.3d 910, 924 (7th Cir. 2012) and *Long v. Teachers' Ret. Sys. of Ill.*, 585 F.2d 344, 349 (7th Cir. 2009)).

Even if Plaintiff had properly developed this argument, it does not change the Court's conclusion that—independently of what the medical records show—Dr. Merkow's *testimony* shows that he informed Plaintiff of the relevant medical information, and Plaintiff has no genuine dispute of fact on this front.

#### 4.1.2.2    Objective Basis

With Plaintiff's arguments as to the reliability of Dr. Merkow's testimony addressed, the Court returns to his more fundamental argument: that the facts do not show that Plaintiff had an objective basis to believe that Defendants' devices caused his injuries until sometime after November 2019, making his suit timely. This argument also fails. The undisputed facts make clear that, for quite some time before filing suit, Plaintiff believed that Defendants' hip devices caused his injuries. Dating back to 2017, Plaintiff sought out Dr. Merkow's medical assistance for hip pain; his medical records reflect that he believed that the pain was caused by either "prosthetic failure or metallosis."[9] ECF No. 19 at 3. Moreover, in April 2019

---

[9]Irrespective of whether Plaintiff's medical records are admissible to prove that Dr. Merkow communicated his diagnoses to Plaintiff, *see supra* note 8, the diagnoses therein are admissible under Rule 803(6). *LaBrec v. Wis. & S. R.R. Co.*, No. 17-CV-828-JDP, 2019 WL 325131 (W.D. Wis. Jan. 25, 2019) ("Courts routinely admit medical records under Rule 803(6) . . . ." (collecting cases)).

The medical records were made by Dr. Merkow, "someone with knowledge" of the "act, event, condition, opinion, or diagnosis" recorded. Fed. R. Evid. 803(6), (6)(A). Plaintiff has not argued, and the Court has no basis to believe, that these medical records were not "kept in the course of a regularly conducted activity of a[n] . . . occupation" nor that "making the record was [not] a regular practice of that activity." *Id.* at 803(6)(B)–(C). And the records were certified as authentic. ECF No. 27 at 13 n.6 (citing ECF No. 27-3 (Certification of Records)).

Finally, the records were "made at or near the time" of the "act, event, condition, opinion, or diagnosis" and have no indicia of untrustworthiness. Fed. R. Evid. 803(6), (6)(A), 6(E). Plaintiff's argument that Dr. Merkow's medical records are untrustworthy because he testified inconsistently as to whether he typically recorded such notes "contemporaneously" with a patient interaction or "the same date" as the interaction is unpersuasive. ECF No. 26 at 8 (referencing ECF No. 27-2 at 7). Plaintiff cites no authority in support of the assertion that notes taken hours after a patient interaction, rather than contemporaneously therewith or sooner after, are inherently untrustworthy. *See id.* But even assuming that Dr. Merkow records patient notes later in the same day as a patient encounter (as opposed to contemporaneously), the Court does not find that the passage of a

Case 2:22-cv-01362-JPS    Filed 08/30/24    Page 24 of 31    Document 28

at the latest, Plaintiff learned information from Dr. Merkow that confirmed this connection, at which time Dr. Merkow also recommended revision surgery. *See* ECF No. 19 at 13 ("Plaintiff avers that he 'did not know the products implanted in his body caused injury until his medical providers recommended removal[,] [t]he timeframe for [which is] reflected in Plaintiff's medical records."). Even if Plaintiff does not recall learning this information, he may not "employ an 'ostrich defense,' closing [his] eyes to reasonably accessible information and refusing to investigate his suspicions of a potential injury." *Waterstone Mortg. Corp. v. Offit Kurman P.A.*, No. 19-CV-1117-JPS, 2020 WL 1066788 (E.D. Wis. Mar. 5, 2020) (citing *Sands v. Menard*, 887 N.W.2d 94, ¶ 63 (Wis. Ct. App. 2016)).

What's more, Plaintiff didn't really bury his head in the sand at all; the record shows that he did his own investigation of his injuries and their likely cause. Plaintiff essentially concedes that, through his own outreach in December 2018 and January 2019 to Zimmer Biomet about his hip devices, he became aware that those hip devices were the likely cause of his elevated cobalt and chromium blood levels and realized that he needed "resolution or a cure" for the issue. ECF No. 19 at 7. Even if the information that Plaintiff had as of January 2019 can be characterized as an "unsubstantiated lay belief," which "is not sufficient for discovery to occur," *Clark v. Erdmann*, 468 N.W. 2d 18, 25 (Wis. 1991), there is no genuine dispute that Plaintiff attained an objective basis to believe that the hip devices were causing his injuries in April 2019, when Dr. Merkow

---

short amount of time makes those notes less trustworthy. *See United States v. Lewis*, 954 F.2d 1386, 1394 (7th Cir. 1992) ("Although the delay between Lewis's statements and Jones's interview was significant—approximately six months—we cannot say that the interval was so long that Jones could not have accurately recalled Lewis's statement during the interview.").

Case 2:22-cv-01362-JPS    Filed 08/30/24    Page 25 of 31    Document 28

recommended that they be removed through revision surgery. At that time, Plaintiff reported to Dr. Merkow that he was "thinking" about having the revision surgery done at a specific time. ECF No. 19 at 11. The facts that Plaintiff learned or should have learned from Dr. Merkow in April 2019, and his expressed interest in and timeline for receiving revision surgery, created a "reasonable likelihood for an objective belief as to an injury and its cause." *Clark*, 468 N.W. 2d at 25; *see also Borello*, 388 N.W.2d 140 at 142, 149 (limitations period commenced when plaintiff received information from medical practitioner that confirmed her hunch that her injuries were caused by defendant's furnace system).

As Defendants point out, even if Dr. Merkow earlier gave alternative explanations of Plaintiff's injuries, Plaintiff has failed to put forth evidence that he himself ever believed those alternative explanations or relied on them. ECF No. 27 at 16 ("Plaintiff never even argues or puts forth any evidence . . . that he subjectively thought or was told that his injuries were caused by something other than the Biomet [d]evices in early 2019."); *see Clark*, 468 N.W. 2d at 26 (holding that the plaintiff's suit was untimely based on when her original doctors informed her of a causal link between a failed surgery and her injury); *cf. Hansen v. A.H. Robins, Inc.*, 335 N.W.2d 578, 583 (Wis. 1983) (holding that plaintiff's suit was timely because she was initially misinformed by her doctor that there was no causal link between the defendant's product and her injury, and the statute of limitations accordingly did not begin to run until she was properly informed). To the contrary, Plaintiff himself theorized all along that Defendants' hip devices were causing his medical problems, and in April 2019 received confirmation of that theory when Dr. Merkow unambiguously recommended revision surgery. *Cf. Mentor*, 463 N.W.2d at 876–77

(limitations period commenced with exploratory surgery on plaintiff's defective prosthetic because plaintiff's doctor had made ambiguous statements about the cause of his injuries in prior consultations); *see also Henley*, 2019 WL 6529433 at *5 (limitations period commenced when plaintiff learned from her doctor merely that her inferior vena cava filter had caused her some form of injury, thus barring her untimely personal injury claim).[10]

For all these reasons, the Court finds that Plaintiff has not adduced evidence "on which the jury could reasonably find" that he lacked knowledge sufficient to trigger commencement of the limitations period. *Delta Consulting Grp., Inc. v. R. Randle Constr., Inc.*, 554 F.3d 1133, 1137 (7th Cir. 2009) (citing *Springer v. Durflinger*, 518 F.3d 479, 483–84 (7th Cir. 2008)). The statute of limitations on Plaintiff's claims against Defendants began to run in April 2019 at the latest. Because Plaintiff filed suit against Defendants on November 17, 2022, his claims are time-barred.

### 4.2    Statute of Repose

Wisconsin's statute of repose bars product liability suits filed fifteen years or more after the injurious product was manufactured, unless the injury in question qualifies as a latent disease. Wis. Stat. § 895.047(5). The

---

[10]Defendants also note that Plaintiff at times suggests in his briefing that commencement of the limitations period depends on Plaintiff having "objective evidence that his Biomet Devices were 'defective'" in a legal sense, ECF No. 27 at 8 (citing ECF No. 26 at 6–7, 9), and argue that this misstates the legal standard. The Court agrees with Defendants. But in any event, the undisputed facts show that Plaintiff reached out to an attorney about his injuries, and at that attorney's recommendation reached out to Dr. Davies to inquire about hip revision surgery on November 7, 2019. ECF No. 19 at 12. This action makes clear that, at that point— three years and ten days before filing suit—Plaintiff had the "operative facts" of a legal claim related to his hip devices. *Henley*, 2019 WL 6529433, at *5 (citation omitted).

Seventh Circuit considers state statutes of repose to be applicable substantive state law under the Erie Doctrine. *See Jaurequi v. John Deere Co.*, 986 F.2d 170, 172–73 (7th Cir. 1993) ("[A] court must apply the law of the state with the most significant relationship to the particular substantive issue. The Second Restatement rule specifically dictates that 'in an action for personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other state has a more significant relationship . . . .'") (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 146 (1979)). As the underlying events of this suit occurred in Wisconsin, *see generally* ECF No. 5 at 2–5, the Court must apply the Wisconsin statute of repose.

Defendants argue that the statute of repose bars Plaintiff's strict liability claims, as Plaintiff's hip implants and their component parts were manufactured in 2003 at the latest—well over fifteen years before Plaintiff's suit—and that the "latent disease" exception does not apply. ECF No. 18 at 20–21; ECF No. 27 at 19–20. As both parties note, the issue of whether injuries caused by an implanted medical device constitute a latent disease has never been addressed in Wisconsin state courts. ECF No. 26 at 10; ECF No. 27 at 19.

Defendant argues that federal district court decisions applying North Carolina state law provide the proper framework. ECF No. 27 at 19–20. These authorities generally hold that symptoms or physical injuries induced by a medical implant are not latent diseases, as they are individual phenomena linked to one cause—the implantation of a medical device—as opposed to a progressive disease lying in wait. *See In re Cook Med., Inc., IVC Filters Mktg., Sales Pracs. & Prod. Liab. Litig.*, No. 1:14-ML-02570-RLY-TAB,

2023 WL 7548281, at *3 (S.D. Ind. July 10, 2023) (declining to apply latent disease exception because plaintiff's injuries stemmed from a single, discrete malfunction in her vena cava filter); *Fulmore v. Johnson & Johnson*, 581 F. Supp. 3d 752, 758 (E.D.N.C. 2022) (denying that plaintiff's injuries constituted a latent disease because they were a collection of discrete symptoms from a faulty medical device and not a true disease).

Plaintiff argues that his injuries—pseudotumors and soft tissue damage stemming from metal contamination—qualify as a latent disease under Wisconsin state law, in that these injuries were part of a "disease process" and are physical pathologies that were not immediately obvious at the time they began. ECF No. 26 at 10–12 (citing *Wilder v. Amatex Corp.*, 336 S.E.2d 66, 72 (N.C. 1985)).

The Court agrees with Defendants; Plaintiff's injuries do not qualify as a latent disease. His hip weakness, pseudotumors, metallosis, and other symptoms were all readily identifiable, discrete physical injuries "arising from [the] placement of a single medical device." *Cook*, 2023 WL 7548281, at *3. Furthermore, the latent disease exception is typically "limited to diseases that develop over long periods of time after multiple exposures to offending substances which are thought to be causative agents, [and] where it is impossible to identify any particular exposure as the first injury." *Id.* (quoting *In re Mentor Corp. ObTape Transobturator Sling Prods. Liab. Litig.*, No. 4:08-MD-2004, 2016 WL 873854, at *2 (M.D. Ga. Mar. 4, 2016)) (internal citations omitted). The archetypal example is asbestosis. *Id.* (citing *Wilder*, 336 S.E.2d at 73). In Plaintiff's situation, it is possible to identify a single exposure to the causative agent—the installation of the hip implants in 2002 and 2003. ECF No. 19 at 2. Plaintiff's injuries stem from the discrete installment of the hip implants. Accordingly, Plaintiff's injuries are not a

latent disease. Moreover, the hip implants were manufactured more than fifteen years before November 2022. *Id*. For all these reasons, Plaintiff's strict liability claims are time-barred under Wisconsin's statute of repose, and the latent disease exception does not apply.

### 4.3    Punitive Damages

The Court will address Plaintiff's punitive damages claim in the interest of completeness. ECF No. 5 at 32. Wisconsin law blocks recovery for Plaintiff in this instance—absent liability for an underlying tort and damages, a plaintiff cannot seek punitive damages from a defendant. *See Boyer v. Weyerhaeuser Co.*, 39 F. Supp. 3d 1036, 1040 n.3 (W.D. Wis. 2014) (citing *Cap. Times Co. v. Doyle*, 807 N.W.2d 666 (Wis. Ct. App. 2011)). Because Defendants cannot be held liable due to Plaintiff's suing outside of the statute of limitations, Plaintiff cannot be awarded punitive damages.

### 5.    CONCLUSION

For the reasons explained above, the Court grants Defendants' motion for summary judgment. ECF No. 17. As explained *supra* note 1, Plaintiff has withdrawn his claims in the amended complaint for strict liability failure to warn, negligent failure to warn and negligent marketing, breach of express warranty, breach of implied warranty, and fraudulent concealment, and the Court adopts that voluntary dismissal and dismisses those claims without prejudice. Therefore, the grant of summary judgment applies to the remaining claims of strict liability and/or negligence for design and manufacturing defects, and for punitive damages, and those claims will be dismissed with prejudice. *See Doss v. Clearwater Title. Co.*, 551 F.3d 634, 639 (7th Cir. 2008). Because all of Plaintiff's claims are now disposed of, the case will be dismissed.

Accordingly,

**IT IS ORDERED** that Plaintiff John P. Nester's voluntary dismissal of his claims for strict liability failure to warn, negligent failure to warn and negligent marketing, breach of express warranty, breach of implied warranty, and fraudulent concealment, Counts II, IV, VII, VIII, and IX in the amended complaint, ECF No. 18 at 4 n.1, be and the same is hereby **ADOPTED**; Counts II, IV, VII, VIII, and IX in the amended complaint be and the same are hereby **DISMISSED without prejudice**;

**IT IS FURTHER ORDERED** that Defendants Biomet, Inc., Biomet Orthopedics, LLC, Biomet U.S. Reconstruction, LLC, and Biomet Manufacturing, LLC's motion for summary judgment on Plaintiff John P. Nester's remaining claims, ECF No. 17, be and the same is hereby **GRANTED**; Counts I, III, V, VI, and X in the amended complaint be and the same are hereby **DISMISSED with prejudice**; and

**IT IS FURTHER ORDERED** that this case be and the same is hereby **DISMISSED**.

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 30th day of August, 2024.

BY THE COURT:

_____

J.P. Stadtmueller
U.S. District Judge